HOOPER (PITMAN v.). See Cases Nos. 11,-185 and 11,186.

---

## Case No. 6,676.

HOOPER et al. v. RATHBONE et al.

[Taney, 519.] [1]

Circuit Court, D. Maryland.   Oct. 15, 1853.

BILL OF LADING—LOSS OF CARGO—DEFINITION OF "PERILS OF THE SEA."

1. Where goods are shipped under a bill of lading, by the terms of which the ship-owners

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

are exempted from responsibility for losses by perils of the sea: and a part of the goods are lost or injured: *Held*, that as a loss by perils of the sea is an exception to the undertaking of the carriers to deliver the cargo safely at the port of delivery, it is incumbent upon them to show that the loss in question was occasioned by such peril; otherwise, they are liable for the whole damage sustained.

[Cited in The Lydian Monarch, 23 Fed. 299.]

2. The ship was on a voyage from Baltimore to Liverpool with a cargo of wheat and tobacco; on the first day out from the capes of the Chesapeake Bay, and for several days after, she experienced heavy weather, and became leaky, the pumps became obstructed, and finally choked from the wheat getting into them; and as a measure of safety she was compelled to put into the port of St. Thomas; there she was unloaded, in order to repair, and a good deal of the wheat was found to be spoiled, and was thrown away; the storm was not violent enough to dismast her or carry away her sails, but it blew heavily; the sea was rough, and the ship was rolling and pitching in it, and shipped a good deal of water before any inconvenience was experienced from the wheat in the pumps: the ship was proved to have been among the strongest ever built in Baltimore; the bin where the wheat was stowed was properly constructed, the pumps properly arranged, the vessel seaworthy, and there was no negligence or misconduct of the master in navigating her: *Held*, that under the circumstances, there was nothing to which the disaster could be imputed, but the perils of the sea.

3. Although a vessel laden with wheat in bulk is more liable to sea-damage than with some other cargoes, and may be disabled from proceeding on her voyage, by encountering winds and waves through which a different cargo might pass without injury; yet, if there was no fault in the ship, in her equipments, in the stowing of the cargo, or in the manner in which she was navigated, and if every precaution was taken which is usual and customary in transporting such a cargo, the owners cannot be charged with the loss.

4. After unloading the ship at St. Thomas, the wheat had to be reshipped in bags, and owing to the greater space occupied by the wheat in bags, than was occupied by it in bulk, and owing also to the want of proper contrivances, at St. Thomas, for stowing the hogsheads of tobacco, 1169 bags of damaged wheat were necessarily left out; there was no trade between Liverpool and St. Thomas, and no prospect of shipping the surplus wheat, except by chartering a vessel at a losing expense; which expense would only have been increased by storing the wheat at St. Thomas, till the owners could be advised, and instructions received from them: *Held*, that under such circumstances, the most judicious course, and the one most for the advantage of the owners, was for the master to sell the wheat at St. Thomas.

[Appeal from the district court of the United States for the district of Maryland.]

The libel in this case was filed on the 4th of December 1852, by the appellees [William Rathbone and others], merchants at Liverpool, and owners and consignees of certain wheat, shipped from Baltimore for that port, in the month of October, 1851, on board the ship A. Cheeseborough, of which the appellants [James Hooper and others] were owners. The libellants charged, that the respondents, their officers, servants and agents, so carelessly and improperly carried said wheat, and so carelessly and improperly and

negligently conducted and managed the said ship A. Cheeseborough, during her said voyage, and so careless, improperly and negligently conducted themselves in reference to the said wheat, that by reason of such careless, improper and negligent conduct, only the amount of 7829½ bushels of said wheat were delivered to the libellants at the port of Liverpool, and the large quantity of 2936 bushels of said wheat, was not delivered to the libellants, but entirely lost to them.

The respondents, in their answer, after replying to the several articles of the libel, stated by way of defensive allegation thereto, that said ship A. Cheeseborough, after the said wheat had been shipped thereon, set sail on her intended voyage, on the 30th day of October, 1851, being then sound, tight, staunch and in every respect in a seaworthy condition, and suitably and properly apparelled and appointed in all particulars for the intended voyage; but that after prosecuting the voyage for some days, the ship encountered boisterous and stormy weather, and heavy seas, and shipped large quantities of water on deck; and by reason thereof, she labored very much, and rolled very heavily, and apprehensions were entertained on board lest, by the straining to to which she had been subjected, some of the seams of the vessel might have been parted, or other injury sustained; these apprehensions were greatly increased when, on trying the pumps, it was found that large quantities of wheat, and but little water came up. As early as the 5th day of November, this state of case existed; during that day, it blew a strong gale, and a heavy sea was running, and a great deal of water was shipped on deck, and the pumps were used every two hours; and as large quantities of wheat were delivered in pumping, it became necessary to draw very often the lower boxes, so as to clear them of wheat. On the following day, it was found that the pumps were so choked by wheat, that it became necessary to draw them every ten minutes, and it was discovered, at the same time, that there was much water in the hold.

On this day, the crew came aft and protested against proceeding further on the voyage; the master, at that time, did not yield to the request, but continued on his course, in hopes and under the expectation of being able to perform the voyage to Liverpool. On the next day, the pumps being still unmanageable, by reason that they choked every few minutes, the crew again came aft and requested the master to make for the first port, as it was not safe, in their opinion, to proceed further on the voyage; as the master, still hoping and expecting to be able to make the voyage in safety, did not at the time assent to this request of the crew, the mate entered his opinion on the log-book, that it was not safe to prosecute the voyage. It was not, however, until the 8th, that the master concluded to comply with the request of the officers and crew, and to make for the nearest port; and he was induced to comply, because the pumps were still continually, when used, choked with wheat; the vessel, still under close-reefed topsails, labored very hard, and took in a great deal of water on deck; and it was, moreover, discovered that smoke was rising from the wheat in the hull. It was under these inducements, and from a conviction that it would be perilous and reckless to hold his course, that the master changed his course, for the Island of St. Thomas, where he arrived on the 17th of November. During the voyage to St. Thomas, and most of the time, the ship made considerable water, and the pumps remained in the same state, and there was evidence that the wheat was being injured. That under such circumstances, the making for an intermediate port, was an incumbent duty on the master which he could not properly, and ought not have disregarded, and the making of the port of St. Thomas, was the making of a port of necessity. That as soon as said port of St. Thomas had been made, the master duly made protest, and applied to the commercial agent of the United States, there resident, to cause a survey to be made by competent and proper persons, of said vessel, &c.; that upon the warrant of said commercial agent, a survey was made on the 18th of November, 1851, by proper and competent persons, who reported that they found the hatches to have been properly secured, but who further reported that, upon trying the pumps, so much wheat came up, that it was impossible to ascertain what quantity of water the ship was making at the time; and they further reported, that it was unavoidably necessary that the cargo should be discharged, in order to have the timbers cleansed, and the pumps placed again in a working condition, and they accordingly recommended, that the cargo should be landed as quickly as possible, and that afterwards another survey should be made, in order to ascertain the state of the vessel, and to determine what further proceedings were necessary for the benefit of all concerned. That in accordance with the recommendation contained in said report, the cargo was in part removed, and a further survey was had of the same, under the direction and by the warrant of the commercial agent, by competent, experienced and proper persons; which said persons, after particularly examining, and surveying that part of the cargo which consisted of wheat in bulk, reported that they found the same in some places musty, and in the wings, wet with sea-water, but without extending far into the bulk of the cargo; and they recommended that the whole of the wheat should be put into bags, and brought on shore, in order that it might be ascertained how much thereof was in a fit condition to be reshipped, and what proportion

thereof was in a perishable state. That in pursuance of such recommendation, the cargo was in part unladen, when by the like authority, a survey was had of the ship and cargo, for the purpose of ascertaining the manner of the storage and the dunnage of her cargo, and particularly of the wheat in bulk; and also for the purpose of acertaining the condition of the said ship, and the mode and extent to which she had sustained damage, and what repairs were necessary to be made, and what should be done with the said wheat; and thereupon it was found and reported by the surveyors, who had been selected on that behalf; that the platform, bulkheads and ceiling of the wheat-bin or pen, had been substantially and protectively built, and that the same were sufficiently high from the ceiling of the ship, and also that the same were properly dunnaged underneath; but the said surveyors further reported that they further found, by examination, that a large quantity of wheat, was actually filled up between the ceiling of the bin, and the ceiling of the ship, and also between the timbers of the ship; and that the wheat had run out from the well-secured bin, through small openings of the ceiling of the bin and bulkheads, which small openings had been made from the straining of the bulkheads, in consequence of the heavy and sudden motion of the ship, in rough weather and heavy seas encountered by the ship on her aforesaid voyage; and that, as the wheat shifted its position to some extent during such motions, the grains were forced through such small openings. And the said surveyors recommended that the bulkheads should be taken down, the platform and the ceiling of the bin, and lumber boards taken up, and the ship's bottom perfectly cleaned out from wheat; and that the wheat below the ceiling, being entirely impregnated with salt water, and without any value, should be thrown away, to save further expenses thereon. That the said cargo was accordingly in great part landed (including all the wheat, except what was so thrown away); a further survey was directed by said commercial agent to be made of said cargo, to ascertain its state and condition, and what was the best to be done with the whole or any part of said cargo, for the benefit of all concerned; and thereupon competent, proper and judicious surveyors, in compliance with the direction to survey as aforesaid, did carefully examine and survey said wheat, which had been so landed, and being of opinion that the same was sound, the said surveyors recommended it all to be reshipped. That upon a former examination of the wheat on board of said ship, it had been found in some places to be musty; and the surveyors then acting, recommended that the whole of said wheat should be put into bags and brought on shore; which had accordingly been done, so that the wheat, when examined on the wharf, and recommended and approved by said surveyors, was already in bags, and when reshipped, it was accordingly reshipped in bags; and so much of said wheat was accordingly reshipped, as it was practicable, safely and properly to reship; but that it was necessary to leave out eleven hundred and sixty-nine bags in restowing the cargo, for want of room; which wheat thus left out, the said surveyors recommended should be sold at St. Thomas, for the benefit of those concerned, as no vessel could be procured to carry it to its destination, except at an exorbitant rate of freight. And said bags of wheat so left out were afterwards sold in conformity with such recommendation, and the proceeds thereof were paid over or remitted to the libellants. And the respondents, therefore, as to the quantity of twenty-nine hundred and thirty-six bushels of wheat mentioned in the libel as not delivered, said that part thereof was lost during the voyage to St. Thomas, and at said last-mentioned place, by being delivered by the pumps. as aforesaid, and thereby becoming damaged and lost; but how much is certain was thus lost, the respondents were not able to ascertain or show with any certainty; that other part thereof was damaged by sea-water, and thrown away as worthless, but how much was thus lost, they could not state with certainty, but they were informed and believed that it was a considerable quantity; and that the residue was not carried in said ship because it was impracticable, safely or properly to carry the same on said ship, and it was sold because it was really best for the interest of those concerned.

The following protest of the crew and officers of the ship was filed with the answer: "At sea, November 6, 1831, at noon. To Captain Binney: We, the undersigned, officers and crew of the ship Cheeseborough, of Baltimore, do hereby make our complaint, that for two or three days we have observed that wheat came out of the pumps at times, so we have to keep drawing the pumps repeatedly; but to-day it has come out in large quantities, so that we have to be continually drawing the boxes to get out little water. At noon, we found that all the pumps choked, and impossible to get the water out of the ship. We, therefore, think it best for the safety of the ship and cargo, to go to the first port to save life. We are all willing to stay by the ship to save cargo and ship to the last, provided that our petition is granted to us; we think it impossible to keep the pumps from choking, as it is growing worse and worse all the time. Your obedient servants, &c. (Signed by the crew and officers.)" The decree of the district court (Glenn, J.) was in favor of the libellants, from which an appeal was taken, and argued before this court.

J. V. L. McMahon and Brown & Brune, for libellants.

Wm. Schley, for respondents.

TANEY, Circuit Justice. The appellants in this case, who were the respondents in the district court, are the owners of the ship Cheeseborough, which sailed from Baltimore for Liverpool, on the 30th of October, 1851. The appellees were libellants in the court below. They shipped by the Cheeseborough, on this voyage, a large quantity of wheat in bulk; the wheat, however, did not load the vessel, and part of her cargo consisted of tobacco, flour and other articles, shipped by other persons.

It appears from the testimony, that the ship was detained (it is presumed by contrary winds) in the Chesapeake Bay; for she did not get to sea until the 4th of November. She went to sea with a fine strong breeze; but during that night, the wind increased, the sea became more rough, and the topsails were double-reefed; the next day, she had strong gales and a heavy sea, in the Gulf Stream, the vessel shipped a great deal of water, and rolled and pitched heavily; and on the afternoon of that day, a good deal of wheat was brought up by the pumps. On the third day out, the pumps choked from the quantity of wheat that got into them, and on the night of that day, the officers and crew presented to the captain a written request to put into the first port; stating in their application, that for two or three days they observed wheat drawn up by the pumps; that on the day before, a large quantity was brought up, and on the day they made the request, the pumps had choked; in speaking of days in this application, the seamen, of course, mean sea-time. The master did not, however, yield immediately to this application, but continued on his course, in the hope that he would be able to reach Liverpool in safety. But the pumps became almost useless from the quantity of wheat that escaped from the bin, and finding from an examination, made on the 11th of November, that the wheat was damaged, and some of it entirely spoiled, that the vessel had become loggy, and that the water was increasing in the hold, he determined to steer for the nearest convenient port, and arrived at St. Thomas on the 13th of the month.

Upon the arrival of the vessel at that port, it appeared, upon examination, that she had two feet of water in the hold, and the space between the bottom of the bin and the skin or ceiling of the vessel was filled up with wet and damaged wheat, which was spoiled and had become offensive in its odor. It was found necessary, upon survey, to unlade the vessel, in order to cleanse her from the damaged and putrid wheat, and put her in a condition to pursue her voyage to Liverpool. The wheat was landed in bags, the sound and undamaged part of the cargo separated from the rest, the damp and swollen part, which it was supposed could be saved, was placed in bags marked with a cross, and the portion which had become utterly spoiled was thrown in the sea, under the orders of the local authorities. After the vessel had been properly cleansed and refitted, the cargo was reshipped, and the vessel pursued her voyage to Liverpool, where she arrived safely and delivered the cargo in good order. The wheat was reshipped in bags, and owing to the want of proper contrivances at St. Thomas, for stowing the hogsheads of tobacco, as compactly as had been done at Baltimore, and owing also to the greater space occupied by wheat in bags, beyond that required for the same quantity in bulk, it was found impossible, upon reloading the vessel, to take on board the whole cargo, and eleven hundred and sixty-nine bags of the wheat marked with a cross were unavoidably excluded; in the language of one of the witnesses, the ship was chock and block full without them. The master, finding himself unable to take those bags, directed them to be sold at St. Thomas, at public auction, and took with him the proceeds of this sale to Liverpool, and paid them over to the libellants, under an agreement that the acceptance of this money should not prejudice any lawful claim they might have to a larger compensation for the loss they had sustained. And this suit is brought to recover the value of the wheat thrown away or sold at St. Thomas, upon the ground that the loss was occasioned by the negligence or misconduct of the ship-owners or their agents, or the want of seaworthiness in the ship, and that they are chargeable, therefore, with the amount which this portion of the wheat would have been worth if it had been brought to Liverpool safe and uninjured. The respondents, on the contrary, insist that the loss was occasioned by the perils of the sea, and that they are not liable for it as carriers, under the bill of lading.

The bill of lading is in the usual form: and as a loss by the perils of the sea is an exception to the undertaking of the carriers to deliver the cargo safely at the port of delivery, it is undoubtedly incumbent upon the respondents to show, that the loss in question was occasioned by such peril, otherwise, they are liable for the whole damage sustained by the libellants. The libellants insist that there is no sufficient proof of any storm or peril of the sea, that could have produced this disaster; and it has been argued, that it must have arisen, either from carrying too much sail, and thereby straining the ship, the first day out, when she appears, by the log-book, to have been pressed so rapidly through the water, or from some defect in the construction of the bin, or in the arrangement of the pumps.

It is true, that the storm was not violent enough to dismast her or to carry away her sails; but the evidence shows that it blew heavily, that the sea was rough, and that the vessel was rolling and pitching in it, before any inconvenience was experienced from the wheat in the pumps.

There is not the slightest evidence that the

ship was strained by carrying too much sail in heavy weather; and the proof is positive and uncontradicted, that the bin was constructed by one of the most experienced ship-joiners in Baltimore, and was examined by him, and the master of the vessel, before the wheat was put in, and found to be without fault; and their judgment is confirmed upon the survey made at St. Thomas after the wheat was unladen, and the construction of the bin examined by the surveyors; and the proof is equally positive and uncontradicted, in relation to the sufficiency, and indeed, the excellency of her pumps.

Now, trying this case upon the testimony before the court, the conclusion is inevitable, that the loss was occasioned by the perils of the sea; for the ship is proved to have been among the strongest ever built in Baltimore; and if the bin was properly constructed, the pumps properly arranged, the vessel seaworthy, and there was no negligence or misconduct of the master in navigating her, there is nothing but the perils of the sea to which the disaster can be imputed. The master and the surveyors at St. Thomas attribute the damage sustained by the cargo to this cause; and this conclusion is further strengthened by the fact, that this ship, strong as she was, had been so strained by the rough weather to which she was exposed, that she leaked considerably more than at the beginning of the voyage, and required a good deal of caulking in her upper works, to enable her to proceed from St. Thomas to Liverpool.

No doubt a vessel laden with wheat in bulk is more liable to sea-damage than with some other cargo; and she may be disabled from proceeding on her voyage by encountering winds and waves, through which a different cargo might pass without injury to the vessel or cargo. But it is not suggested that vessels of a different description from this, or differently fitted out, or differently laden, are required to transport wheat in bulk. And if there was no fault in the ship, or in her equipments, or in the stowing of the cargo, or in the manner in which she was navigated; and if every precaution was taken which is usual and customary in transporting such a cargo, I see no ground upon which the ship-owners can be charged with the loss. [Clark v. Barnwell] 12 How. [53 U. S.] 282, 283.

It is true, that in the written application of the crew to the master, to put into the nearest port, which was presented on the night of the third day out, they stated that they had, for two or three days before, observed wheat brought up by the pumps; and this statement would seem to imply that wheat had been leaking from the bin before the vessel was exposed to the rough weather spoken of in the testimony. If this was the case, it must undoubtedly have arisen from the imperfect construction of the bin, and the respondents would be answerable for all the damage sustained by the cargo. But these loose expressions in a paper of this kind, cannot outweigh the positive testimony of the witnesses examined in the case, and who testify to the sufficiency of the bin, and to the occurrence of strong gales and heavy seas, before any inconvenience was experienced from the wheat.

Nor do I see anything in the conduct of the master at St. Thomas, of which the libellants have cause to complain. It was obviously necessary to unlade the ship; and every precaution appears to have been taken to preserve the wheat from further damage. It could not be reshipped in the bin, as the whole cargo would inevitably have been lost, if the damp and damaged portion of the wheat had been mixed in bulk with the good. It was, therefore, absolutely necessary that it should be shipped in bags; and it is by no means clear, that the bags left behind could have gone in safety to Liverpool, if shipped with the rest of the cargo; for it appears that the wheat in some of them (how many is not stated) was still swelled and sticking together in cakes, when it arrived at New York. The surveyors, indeed, thought that it could all go safely to Liverpool; but the master thought otherwise; and I am inclined to think he was right.

However this may be, they were unavoidably left out, for the ship would not hold them; in the language of one of the witnesses, she was full, chock and block, without them; and, as they could not be transported in the Cheeseborough, it was evidently the interest of the owners to sell these bags of wheat at St. Thomas. There is no trade between Liverpool and St. Thomas, and there was, therefore, no prospect of shipping them from that port, unless a vessel was chartered for the special purpose; and the proof is, from those whose business required them to charter vessels, that they would not have engaged to charter one to take on board this wheat, in sixty days, at the rate of one dollar and fifty cents per bag, each bag containing only about two bushels. If they had been carried to Liverpool at such a freight as this, and the wheat, when it reached the port, found to be in the damaged condition in which it reached New York, it would probably have been a losing voyage to the owners; if it had been left in store at St. Thomas until the owners could be advised of the condition in which it was, the expense of storage would have been added to that of freight. The most judicious course, therefore, and the one most for the advantage of the owners, was to sell it at St. Thomas. This was done by the master, and the money accounted for and paid over; the sale appears to have been perfectly fair and for a fair price, and the conduct of the master, from the time the disaster happened, appears to have been not only honest and upright in intention, but marked also by much prudence and caution. The damaged wheat was placed in suitable

places to dry, and when he found that all of it could not be taken to Liverpool, the best of the damaged bags were carefully selected, and stowed on shipboard in the manner best calculated to protect the wheat from future injury. I see nothing in any part of his conduct of which the libellants have a right to complain; his duty to the shippers as well as to the ship-owners, appears to have been faithfully and judiciously performed; and there is nothing in the evidence to show that either party sustained the slightest damage from anything he did or omitted to do at the port of distress. The decree of the district court, therefore, must be reversed, and the libel dismissed with costs.